# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

―――――――――――――

Nº 09 Civ. 8136 (RJS)

―――――――――――――

IN RE VARGAS REALTY ENTERPRISES, INC.

VARGAS REALTY ENTERPRISES, INC., NOBLE REALTY CORP.,
V & R REALTY CORP., E.R. PROPERTIES, INC.,

Appellants,

VERSUS

CFA W. 111 STREET, L.L.C.,

Appellee.

―――――――――――――

OPINION AND ORDER
November 1, 2010

―――――――――――――

RICHARD J. SULLIVAN, District Judge:

Vargas Realty Enterprises, Inc., Noble Realty Corp., V & R Realty Corp., and E.R. Properties, Inc. (collectively, "Appellants") appeal the August 3, 2009 Order of the Honorable Stuart M. Bernstein, Bankruptcy Judge, (the "August 2009 Order"), granting the motion of CFA W. 111 Street, L.L.C. ("CFA" or "Appellee") to dismiss Appellants' Amended Adversary Complaint. Appellants assert that the Bankruptcy Court erred in its conclusions of law and offer at least two new arguments against Appellee on appeal. For the reasons set forth below, the August 2009 Order is affirmed.

## I.  BACKGROUND

### A.  Facts

Appellants are corporations that own real property on 111th Street in New York City. (Joint Appendix ("J.A.") at 65 ¶ 35; 344.) Victor Vargas is the sole shareholder and president of each Appellant company. (*Id.* at 56.) Since 2001, Victor Vargas's then-spouse, Rosa Vargas, and son, Henry Vargas, held themselves out to be agents of Appellants on at least five separate occasions. (*Id.* at 56 ¶ 5A; 58 ¶¶ 8, 12; 59 ¶ 16; 60 ¶ 24.) Appellants maintain that neither Rosa Vargas nor Henry Vargas was ever an officer, director, shareholder, manager, agent or employee of Appellants.

(*Id.* at 57 ¶ 5D; 58 ¶ 7; 59 ¶ 16; 62 ¶ 30; 64 ¶¶ 34E, 34F.) However, on each of these occasions, Rosa or Henry Vargas carried out a loan transaction with a financial institution purporting to be Appellants' agent and created a lien against Appellants' properties. (*Id.* at 56 ¶ 5A; 58 ¶¶ 8, 12; 59 ¶ 16; 60 ¶ 24.) Each transaction was carried out without Victor Vargas's prior consent or knowledge. (*Id.*) Nevertheless, upon learning of the unauthorized transactions, Victor Vargas accepted the resulting obligations on every occasion and never took steps to invalidate them. (*Id.* at 57 ¶ 5C; 58 ¶ 10; 59 ¶¶ 15, 19; 60 ¶ 21.)

In January 2007, Rosa Vargas, purporting to be vice president of Appellants, entered into a loan refinancing transaction with Sovereign Bank at the behest of Henry Vargas, who arranged the loan. (*Id.* at 59 ¶¶ 16-18.) As in the past, once Victor Vargas learned of the transaction, he complied with its obligations and did not attempt to undo it. (*Id.* at 59 ¶ 19; 60 ¶ 22.) According to Appellants, Henry Vargas arranged the transaction for his own personal benefit. (*Id.* at 59 ¶ 18.) Victor Vargas contends that he approved this and the preceding transactions because he believed the properties could remain viable under the loan obligations and he sought to avoid adverse consequences for his son. (*Id.* at 59 ¶ 19; 60 ¶ 21.)

On August 28, 2007, Henry Vargas again held himself out to be Appellants' agent and executed a promissory note for the principal amount of $8,000,000.[1] (*Id.* at 60 ¶¶ 24, 25; 104-115.) The note was made out

to CFA and was secured by Appellants' real properties. (*Id.* at 60 ¶ 26.) At that time, Appellants did not need additional funds from an operating standpoint. (*Id.* at 61 ¶ 25; 62 ¶¶ 26-27; 345.) Although the record is unclear as to how much of the CFA loan benefitted Appellants, the following facts are undisputed: (1) at least $400,000 was used to satisfy the interest payments for the first five months (*id.* at 61 ¶ 24); (2) a large portion of the loan — approximately $5,000,000 — was used to satisfy Appellants' prior debt to Sovereign Bank (*id.* at 61 ¶ 29); and (3) approximately $1,000,000 was paid to a corporation owned by Henry Vargas (*id.* at 62 ¶ 29). The interest rate (12.25%) on the CFA note was twice the rate (6.125%) of the Sovereign Bank loan with a default rate of interest of 24%. (*Id.* at 60 ¶ 21; 61 ¶ 27.)

On April 1, 2008, Appellants defaulted on their repayment obligations to CFA. (*Id.* at 87 ¶ 7.) Thereafter, in the summer of 2008, Appellee filed a foreclosure action in New York State Supreme Court against Appellants for defaulting on the CFA note, and obtained appointment of a receiver. (Appellants' Br. at 3; Appellee's Br. at 2.) Although Victor Vargas became aware that a "refinancing" had cleared Appellants' debt to Sovereign Bank shortly after September 2007, Appellants claim that Victor Vargas did not learn of the CFA note and mortgage until CFA brought the foreclosure proceeding against Appellants. (*Id.* at 61 ¶¶ 24, 24A.)

In order to avoid foreclosure and in an effort to reach a settlement or restructuring of the note and mortgage, Appellants executed a pre-negotiation agreement with Appellee (the "Pre-Negotiation Agreement" or the "Agreement"). (Appellants' Br. at 3; Appellee's Br. at 2; J.A. at 335-36.) The Agreement, *inter alia*, confirmed

---

[1] Appellants refer to September 14, 2007 as the date when Henry Vargas executed the CFA note and mortgage (*id.* at 60 ¶¶ 24, 25), while Appellee dates the same event as August 28, 2007 (*id.* at 87 ¶¶ 3, 4). The Court adopts the latter date in this opinion because the Consolidated Secured Promissory Note is dated August 28, 2007. (*Id.* at 104-15.)

Appellants' obligations under the loan. (Appellants' Br. at 3; Appellee's Br. at 2; J.A. at 335-36.)  Both parties concede that as a condition to entering into any settlement discussions, CFA insisted that Appellants execute the Agreement.  (Appellants' Br. at 3; Appellee's Br. at 2; J.A. at 335-36.)  On December 5, 2008, both Victor and Henry Vargas signed the Agreement on Appellants' behalf with counsel present. (Appellants' Br. at 3; Appellee's Br. at 2-3.) The Agreement confirmed Appellants' "legal and enforceable obligations" under the loan as well as their waiver of "any defenses, counterclaims or offsets," including any that could potentially be raised in the foreclosure action.  (J.A. at 76 ¶ 7.)    The Agreement makes clear that Appellee did not waive its "rights or remedies including the right to demand immediate payment of all sums due under the Loan Documents."  (*Id.* at 76 ¶ 5.)  The Agreement also provides that "[b]oth Borrower and Lender have reviewed th[e] letter agreement with counsel, understand the agreements contained [t]herein, and have agreed to execute and deliver th[e] letter agreement as its own free act and deed without duress."  (*Id.* at 77 ¶ 11.)

After attempting to negotiate a settlement for approximately two months (*id.* at 333), the parties were unable to reach a resolution of the matter (*id.* at 335).  On January 29, 2009, Appellants voluntarily filed a Chapter 11 petition in the United States Bankruptcy Court for the Southern District of New York and requested a stay of Appellee's foreclosure action.  (*Id.* at 338.)

B.  Procedural History

On May 25, 2009, Appellants commenced the present adversary proceedings before the Honorable Stuart M. Bernstein, Bankruptcy Judge.  (*Id.* at 25.)

On June 11, 2009, Appellants amended the four adversary complaints.[2]  (*Id.* at 73.) Appellants' Amended Adversary Complaint requested the following:  (1) that the CFA note and mortgage be declared invalid and unenforceable because Henry Vargas lacked authority to execute the deal and CFA failed to perform due diligence; (2) that the Pre-Negotiation Agreement be nullified as a fraudulent conveyance, preference payment, contract of adhesion, and/or invalid contract for lack of consideration; and/or (3) that CFA's claim be equitably subordinated to all other creditors because CFA procured the deal through fraud or misconduct.  (*Id.* at 55-73.)  On July 1, 2009, Appellee moved to dismiss the Amended Adversary Complaint pursuant to 11 U.S.C. §§ 105(a), 510(c), 547; Federal Rule of Bankruptcy Procedure 7012; and Federal Rule of Civil Procedure 12(b)(6).  (*Id.* at 85-102.)  Appellee argued that, to the extent Henry Vargas may have lacked authority, Appellants ratified the CFA note and mortgage when they executed the Pre-Negotiation Agreement and Appellants failed to assert a valid basis upon which the Agreement could be nullified. (*Id.*)

Following oral argument on July 23, 2009, the Bankruptcy Court dismissed the consolidated adversary action against Appellee.  (*Id.* at 344.)  Judge Bernstein concluded as follows:  (1) Appellants ratified the CFA note and mortgage when Victor Vargas executed the Pre-Negotiation Agreement after reviewing it with counsel and when Appellants accepted at least a partial benefit of the transaction (*id.* at 346-51); (2) the Pre-Negotiation Agreement was not a fraudulent conveyance because it was not a transfer and, even if it could be

---

[2] The separate cases were consolidated by an Order of the Bankruptcy Court (*id.* at 332), and have also been consolidated for the purposes of this appeal by an Order of the Court (Doc. No. 5).

construed as one, Appellants could not satisfy the requisite elements necessary to make a fraudulent conveyance claim (*id.* at 351-52); (3) Appellants failed to plead all of the elements of an unlawful preference claim (*id.* at 352-53); (4) CFA's use of its position to drive a harder bargain was not wrongful conduct warranting equitable subordination of its claim (*id.* at 353-55); and finally, (5) the Pre-Negotiation Agreement was neither a product of coercion or duress nor a contract of adhesion because Appellants had other alternatives to signing it, such as rejecting the Agreement or filing a Chapter 11 case sooner (*id.* at 355-57).

On November 13, 2009, Appellants appealed the August 2009 Order to this Court, requesting its reversal and either a remand for further pre-trial proceedings or a declaration that the CFA note and mortgage are void. (Appellants' Br. at 25.)

## II. STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 158(a)(1), district courts are vested with jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy courts. The district court evaluates the bankruptcy court's findings of fact for clear error and its conclusions of law *de novo*. *In re Bennett Funding Group, Inc.*, 146 F.3d 136, 138 (2d Cir. 1998). Because the sufficiency of a complaint under Rule 12(b)(6) is a question of law, *Goldberg v. Danaher*, 599 F.3d 181, 183-84 (2d Cir. 2010), the Court reviews the Bankruptcy Court's decision to grant the motion to dismiss *de novo*. *See Raine v. Lorimar Prods., Inc.*, 71 B.R. 450, 452 (S.D.N.Y. 1987) (reviewing *de novo* a bankruptcy court's dismissal of a complaint for failure to state a claim).

On a motion to dismiss under Rule 12(b)(6), the Court must draw all reasonable inferences in plaintiffs' favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Nonetheless, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Therefore, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 1949.

Ultimately, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. On the other hand, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Where plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III. DISCUSSION

Appellants allege for the first time on appeal that the CFA note and mortgage were

criminally usurious and executed as part of a criminal scheme by Appellee to take over Appellants' properties. (Appellants' Br. at 8-11.) Appellants also argue that the Bankruptcy Court erred in finding that Appellants ratified the CFA note and mortgage through their execution of the Pre-Negotiation Agreement. Appellants contend that the Pre-Negotiation Agreement is not enforceable because it lacked consideration, is a contract of adhesion, amounted to a fraudulent conveyance, and/or violated public policy. (*Id.* at 11-25.) Lastly, Appellants request that Appellee's claim be equitably subordinated to all other claims based on Appellee's inequitable conduct. (*Id.* at 23-24.)

Having carefully reviewed the record, the Court finds that the Bankruptcy Court properly granted Appellee's motion to dismiss all of the claims pleaded in the Amended Adversary Complaint. Accordingly, the August 2009 Order is hereby affirmed.

### A.  The CFA Note and Mortgage

### 1.  Criminal Usury

Appellants advance a claim of criminal usury for the first time on appeal. (*Id.* at 8-11.) Generally, an appellate court will not consider a claim that is raised for the first time on appeal. *See In re Worldcom, Inc.*, No. 07 Civ. 3408 (DLC), 2007 WL 2682882, at *8 (S.D.N.Y. Sept. 14, 2007) (finding that appellant's failure to raise a claim before the Bankruptcy Court served as a waiver of that claim since appellant had ample opportunity to present the claim below); *see also Singleton v. Wulff*, 428 U.S. 106, 120 (1976); *Schmidt v. Polish People's Republic*, 742 F.2d 67, 70 (2d Cir. 1984). "This is true whether the appeal follows a full factual trial or whether the new

appellate claim is a purely legal question following a summary dismissal proceeding." *Schmidt*, 742 F.2d at 70 (citation omitted). However, a court sitting on the appellate level has discretion to hear a new issue when necessary to avoid a manifest injustice or where the issue is purely legal and does not require additional fact-finding. *See Matar v. Dichter*, 563 F.3d 9, 13 n.4 (2d Cir. 2009) (citation omitted); *see also Singleton*, 428 U.S. at 121; *List v. Fashion Park, Inc.*, 340 F.2d 457, 461 (2d Cir. 1965); *Sapir v. Sartorius*, 230 B.R. 650, 653 (S.D.N.Y. 1999). Because Appellants' claim that the CFA loan was criminally usurious is a purely legal issue that does not require further fact-finding, the Court will exercise its discretion to examine the claim.

Appellants charge that the CFA note and mortgage were criminally usurious under New York Penal Law § 190.40 and New York General Obligations Law §§ 5-511, 5-501-1, and 5-501-6-a. (Appellants' Br. at 8.) Under those statutes, an entity is guilty of criminal usury if it knowingly charges an interest rate on a loan or forbearance in excess of 25%. N.Y. Penal Law §§ 190.40, 190.42. However, the provisions regulating the maximum rate of interest do not apply to "any loan or forbearance in the amount of two million five hundred thousand dollars or more," N.Y. Gen. Oblig. Law § 5-501(b)(6), or to interest rates on defaulted obligations, *see Manfra, Tordella & Brookes, Inc. v. Bunge*, 794 F.2d 61, 63 n.3 (2d Cir. 1986) (holding that the New York usury laws do not apply to interest charged on past due debts).

Contrary to Appellants' assertions, the CFA note and mortgage were not criminally usurious under New York law. According to the terms of the CFA note, the pre-default interest rate on the CFA loan was 12.25% per annum (J.A. at 105), and the default

interest rate was 24% per annum (*id.* at 107). Therefore, both interest rates are clearly below the statutory limit. As to Appellants' claim that the interest rates reflected on the note are inaccurate, New York General Obligations Law § 5-501(b)(6) precludes this loan from the maximum interest rate restrictions because it exceeds $2,500,000.[3] The CFA note, though made out to four borrowers, represented a "single note" in the principal amount of $8,000,000 (J.A. at 116), and not four separate notes, each under $2,500,000, as Appellants allege (Appellants' Br. at 9). Moreover, because New York's criminal usury laws do not apply to interest rates on defaulted obligations, *see Manfra, Tordella & Brooks*, 794 F.2d at 63 n.3, Appellants' claim that the defaulted interest rate is criminally usurious is simply incorrect.

## 2. Ratification

Appellants also challenge the validity of the underlying CFA note and mortgage, arguing that Henry Vargas was not authorized to enter into a loan transaction with Appellee on Appellants' behalf. (Appellants' Br. at 2-3.) Whether or not Henry Vargas had actual or apparent authority to enter into such transactions, Appellants ratified the transaction when they executed the Pre-Negotiation Agreement,

rendering the note and mortgage valid and enforceable against Appellants.

"Ratification is the express or implied adoption, *i.e.*, recognition and approval, of the unauthorized acts of another." *Orix Credit Alliance v. Phillips-Mahnen, Inc.*, No. 89 Civ. 8376 (THK), 1993 WL 183766, at *4 (S.D.N.Y. May 26, 1993). "Under New York law, a principal can be held liable for the unauthorized acts of an agent that the principal later ratifies." *RLI Ins. Co. v. Athan Contracting Corp.*, 667 F. Supp. 2d 229, 235 (E.D.N.Y. 2009); *see Marqusee v. Hartford Fire Ins. Co.*, 198 F. 475, 477 (2d Cir. 1912) ("[O]ne may ratify an unauthorized contract made on his behalf and [] the effect is the same as if he had himself originally made the contract."). "Ratification requires acceptance by the principal of the benefits of an agent's acts, with full knowledge of the facts, in circumstances indicating an intention to adopt the unauthorized arrangement." *Monarch Ins. Co. of Ohio v. Ins. Corp. of Ir. Ltd.*, 835 F.2d 32, 36 (2d Cir. 1987). Ratification also occurs when a principal fails to object to the unauthorized act of another, despite an opportunity to do so. *See Phillips-Mahnen*, 1993 WL 183766, at *5; *see also RLI Ins. Co.*, 667 F. Supp. 2d at 235 ("[W]here the principal knows of an unauthorized act taken on his behalf and remains silent, he is deemed to have ratified the act" (internal quotation marks and citation omitted).). A principal may ratify even those unauthorized acts deemed to be fraudulent. *See Prudential Ins. Co. of Am. v. BMC Indus., Inc.*, 630 F. Supp. 1298, 1300 (S.D.N.Y. 1986);[4] *see also HSBC Bank*

---

[3] Appellants contend that the 24% default interest rate reflected by the CFA note is inaccurate because the 24% figure is based on an interest payment of $160,000 per month pursuant to an $8,000,000 loan. Appellants argue that they did not actually receive the full $8,000,000. Therefore, Appellants contend that when the $160,000 per month charge is calculated based on the amount actually received (either the $5,235,174.40 paid to Sovereign Bank, or $6,864,908.91, which represents the $1,135,591.09 paid to Henry Vargas in addition to the amount paid to Sovereign Bank), the interest rate is actually 36.67% or 27.97%, respectively, and in violation of New York Penal Law §§ 190.40, 190.42. (Appellants' Br. at 8-9.)

[4] In an action for rescission based on fraud, this court has stated that waiver will be found where, subsequent to the discovery of the fraud, the party later claiming a right to rescind has continued to accept the benefits of the agreement or acted in some other fashion inconsistent with exercise of a right

*USA, Nat'l Ass'n v. Adelphia Commc'ns Corp.*, No. 07 Civ. 553A (RJA), 2009 WL 385474, at *6 (W.D.N.Y. Feb. 12, 2009) ("The doctrine of ratification applies to transactions sought to be avoided as fraudulent transfers.").

It is undisputed that Victor Vargas eventually became aware that his son, Henry Vargas, had carried out the CFA note and mortgage transaction on Appellants' behalf and that Victor Vargas then entered into a Pre-Negotiation Agreement that confirmed Appellants' obligations under that note. Whether or not Henry Vargas lacked actual or apparent authority to execute a valid loan on behalf of Appellants, Appellants thereafter ratified the underlying note and mortgage transaction twice: first, when Appellants failed to object or attempt to undo the transaction upon learning of it; and, second, when Appellants executed a Pre-Negotiation Agreement that acknowledged their "legal and enforceable obligations" to Appellee under the CFA note and mortgage "without any defenses, counterclaims or offsets." (J.A. at 76 ¶ 7.)

Appellants allege that Victor Vargas did not learn of the CFA note and mortgage until approximately a year after it was recorded. (*Id.* at 61.) This was despite the fact that in the interim Victor Vargas became aware that a "refinancing" had taken place large enough to satisfy a prior $5,000,000 debt to Sovereign Bank. (*Id.*) Once Victor Vargas undisputedly discovered that his son had carried out the unauthorized dealing, the record does not indicate that Victor Vargas either challenged or attempted to invalidate the transaction. (*Id.* at 59 ¶¶ 15, 19.) Appellants concede that at least twice in the recent past Victor Vargas had acquiesced to other unauthorized transactions entered into by his son through inaction. (*Id.*) Similarly, Appellants' decision to remain silent upon learning of the CFA note and mortgage served to ratify that transaction.

Indeed, rather than seize upon an opportunity to object to the CFA note and mortgage, Appellants took actions manifesting their intent to ratify the allegedly unauthorized transaction. First, Appellants accepted the benefits of the transaction. It is undisputed that at least $5,000,000 of the $8,000,000 CFA loan was used to satisfy a prior debt owed to Sovereign Bank and that at least $400,000 was used to make interest payments on behalf of Appellants. (Appellants' Br. at 4.) The Bankruptcy Court concluded that Appellants had received "a substantial amount" of the note proceeds, "possibly as much as seven million dollars at closing." (J.A. at 350.) There is nothing in the record to indicate that Appellants ever attempted to forego these benefits. Second, Appellants possessed full knowledge of the facts when they executed the Pre-Negotiation Agreement. Appellants concede that they were aware of the allegedly fraudulent nature of the underlying loan when they entered into the Agreement, which explicitly confirmed their obligations under that loan. (*Id.* at 76 ¶ 7.) Moreover, it is undisputed that Appellants were represented by counsel, who was actually present when Appellants

---

> to rescind. A waiver requires the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it. Ratification results when a party to a voidable contract accepts benefits flowing from the contract, or remains silent, or acquiesces in contract for any considerable length of time after he has opportunity to annul or void the contract. By her own acts or words, a party may ratify what would otherwise be a questionable contract.

*Prudential Ins. Co.*, 630 F. Supp. at 1300 (internal quotation marks and citations omitted).

signed the Agreement confirming their legal obligations under the loan. (Appellee's Br. at 19; J.A. at 346.) Further, the circumstances surrounding the execution of the Agreement indicate that Appellants intended to ratify the CFA note and mortgage. Appellants signed the Pre-Negotiation Agreement in exchange for Appellee's agreement to participate in negotiations relating to the disposal or restructuring of the CFA note and mortgage. (J.A. at 75-81.) Accordingly, absent a finding that the Pre-Negotiation Agreement is invalid or unenforceable, Appellants' failure to object after learning of the CFA note and mortgage and their subsequent entry into an agreement confirming their obligations under the CFA loan served as proper ratification of the underlying loan transaction.

### B. The Pre-Negotiation Agreement

Appellants next challenge the Bankruptcy Court's finding that the Pre-Negotiation Agreement was a valid and enforceable contract. Appellants contend that the Pre-Negotiation Agreement was not valid because it lacked consideration, was a contract of adhesion induced by coercion or duress, was part of a criminal enterprise, amounted to a fraudulent conveyance, and/or was against public policy. (Appellants' Br. at 10-25.) Appellants further request that Appellee's claim be equitably subordinated. (*Id.* at 23-24.) For the reasons set forth below, we affirm the Bankruptcy Court's findings and deny Appellants' request for equitable subordination.

### 1. Consideration

Appellants allege that the Pre-Negotiation Agreement lacked consideration. Under New York law, all contracts must be supported by consideration, defined simply as "a bargained-for exchange of promises or performance." *Ferguson v. Lion Holdings, Inc.*, 312 F. Supp. 2d 484, 494 (S.D.N.Y. 2004) (citing Restatement (Second) of Contracts § 71 (1981)). To this end, it is well settled that parties are free to set the terms of a contract as they see fit "even if the consideration exchanged is grossly unequal or of dubious value, the operative factor being whether the promised consideration is acceptable to the promisee." *Goldston v. Bandwidth Tech. Corp.*, 859 N.Y.S.2d 651, 657 (App. Div. 2008) (internal quotation marks and citations omitted). The law is equally clear that a bargained-for agreement to negotiate when there is no legal obligation to do so is fair consideration. *See Mass. Mut. Life Ins. Co. v. Gramercy Twins Assocs.*, 606 N.Y.S.2d 158, 160 (App. Div. 1993) ("The promise to negotiate can not be equated with a promise to finalize an agreement. . . . All that plaintiff promised defendant was an opportunity to negotiate a settlement. The bargain was fulfilled" when the parties negotiated.); *see also Fed. Home Loan Mortgage Corp. v. Drofran Realty Corp.*, No. 95 Civ. 5858 (RPP), 1996 WL 15680, at *1-3 (S.D.N.Y. Jan. 17, 1996) (enforcing the terms of parties' agreement to engage in negotiations); *U.S. Bank Nat'l Ass'n v. 23rd St. Dev., LLC*, No. 600140/09, 2009 WL 3337595, at *3 (N.Y. Sup. Ct. Aug. 27, 2009) (finding a pre-negotiation agreement valid, even where negotiations could be terminated "for any reason or no reason" under the contract).

Here, there can be little dispute that Appellants' execution of the Pre-Negotiation Agreement in exchange for Appellee's agreement to engage in settlement negotiations served as valid consideration. Appellants concede that they signed the

Agreement with the understanding that Appellee would thereafter negotiate a possible settlement with Appellants. (J.A. at 68.) The Bankruptcy Court correctly noted that Appellee had no legal obligation to participate in settlement negotiations (*id.* at 352), and Appellee's decision to do so was likely motivated by its desire "to drive a harder bargain than the debtors preferred" (*id.* at 354). Moreover, Appellants do not provide details or assert facts that suggest Appellee did not engage in the bargained-for negotiations in good faith. Accordingly, there is no basis for disturbing the Bankruptcy Court's conclusion that Appellee's agreement to engage in settlement negotiations, which the parties did in fact engage in (*id.* at 199), provided fair consideration. That the bargained-for negotiations did not end favorably for Appellants does not now transform the Agreement into an unenforceable contract.

### 2. Contract of Adhesion and Coercion

Similarly, the Pre-Negotiation Agreement does not constitute an impermissible contract of adhesion. "The elements of a contract of adhesion are (1) a necessity of life; (2) a contract for the excessive benefit of the offeror; (3) an economic or other advantage of the offeror; and (4) the offer of the proposed contract on a take-it-or-leave-it basis." *Weidman v. Tomaselli*, 365 N.Y.S.2d 681, 686 (Co. Ct. 1975), *aff'd* 386 N.Y.S.2d 276 (App. Term 1975). "Typical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change the contract's terms." *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) (citation omitted). However, the fact that a form is offered on a take-it-or-leave-it basis,

standing alone, is insufficient to render a contract invalid. *Anonymous v. JP Morgan Chase & Co.*, No. 05 Civ. 2442 (JGK), 2005 WL 2861589, at *6 (S.D.N.Y. Oct. 29, 2005). Nor is mere disparity in bargaining power sufficient to show that a contract of adhesion exists. *Ranieri v. Bell Atl. Mobile*, 759 N.Y.S.2d 448, 449 (App. Div. 2003). Rather, a party seeking to rescind an alleged contract of adhesion must show that the other party "used 'high pressure tactics' or 'deceptive language' or that the contract is unconscionable." *Klos*, 133 F.3d at 168 (citation omitted). Absent such a showing, a court will not interfere with an otherwise valid agreement.

Clearly, Appellants have failed to demonstrate that the Pre-Negotiation Agreement was a contract of adhesion. (Apellants' Br. at 12-16.) Contrary to Appellants' contention, the business investments at issue do not qualify as a "necessity of life." While they appear to have been lucrative investments (*id.* at 12), Appellants do not even assert that the four relevant real properties constituted Victor Vargas's only means of income. As the Bankruptcy Court noted, necessities of life include "food, shelter, clothing, medicine and basic similar personal needs," and do not include business investments. (J.A. at 356.)

In any event, Appellants also do not satisfy the remaining elements for a contract of adhesion. Appellants cannot fault Appellee for using its full bargaining position to achieve a favorable agreement where the contract is otherwise valid. Even harsh or unfair terms, from the offeree's view, do not transform an enforceable agreement into a contract of adhesion where an offeree could have made a counteroffer or rejected the offer. *Weidman*, 365 N.Y.S.2d at 686-87. Thus, the Bankruptcy

Court correctly determined that the Agreement was not a contract of adhesion because, *inter alia*, Victor Vargas faced alternatives to signing it. (J.A. at 356.) For example, Appellants could have rejected the terms of the Agreement and fought the foreclosure or filed a Chapter 11 case sooner. (*Id.*)

Moreover, the facts do not show that the disparity in bargaining power was such that Appellee coerced Victor Vargas into signing the Agreement under duress. The law is clear that "the fact that a party may have engaged in hard bargaining is insufficient to establish duress." *Orix Credit Alliance, Inc. v. Bell Realty, Inc.*, No. 93 Civ. 4949 (LAP), 1995 WL 505891, at *4 (S.D.N.Y. July 27, 1995). One must show that there existed an unlawful threat that precluded a party's exercise of free will. *Id.* Here, Appellants were admittedly in a difficult bargaining position when presented with the Pre-Negotiation Agreement. However, this fact does not make the Agreement deficient. Victor Vargas was not an unrepresented or needy individual. Rather, he was the president and sole shareholder of at least four businesses and had been in the real estate profession for approximately 40 years. (J.A. at 56; 227 ¶ 38.) Additionally, his decision to execute the Pre-Negotiation Agreement on behalf of Appellants was freely made and executed with the assistance of counsel, who presumably made him aware of the terms and consequences of signing the contract.[5] (Appellee's Br. at 14; J.A. at 346.)

Put simply, Appellants have failed to state any facts that support a claim of contract of adhesion. Rather, the facts

indicate that Appellants made a calculated and strategic decision under advice of counsel to execute the Pre-Negotiation Agreement in an effort to negotiate a more favorable settlement with Appellee and avoid foreclosure. (Appellants' Br. at 10.) Accordingly, the Court concurs with the Bankruptcy Court and refuses to declare the Agreement null on the basis of this claim.

### 3. Criminal Enterprise

Appellants argue for the first time on appeal that the Pre-Negotiation Agreement, along with the underlying CFA note and mortgage, were part of Appellee's criminal scheme to take over Appellants' properties. (*Id.* at 10-11.) Specifically, Appellants allege that:

> [T]he known facts show predatory lending, impossible terms, kickback to a third person . . . , failure to do any due diligence, immediate filing of foreclosure without any notice to or communication with the Debtors, and the scheme or requiring the Debtors in the Pre-Negotiation Agreement to waive all of their defenses to the foreclosure action as a prior condition to being able to talk settlement with CFA, and using the [A]greement to attempt to terminate the Debtor's rights in the Bankruptcy Court to vacate CFA's illegally-acquired note and mortgage.

(*Id.*)

The entirety of Appellants' argument is conclusory. Appellants do not direct the Court to a single case or fact that would substantiate this claim. Nor does the Amended Adversary Complaint allude to the possibility that a criminal scheme was underway. Thus, Appellants have not stated

---

[5] Upon executing the Pre-Negotiation Agreement, both parties confirmed that they had reviewed it with counsel and understood the agreements contained therein. (J.A. at 77 ¶ 11.)

a viable claim of criminal enterprise upon which relief can be granted.

Moreover, as stated above, the Court will not consider a claim raised for the first time on appeal unless a manifest injustice would result or the issue is purely legal. *See Matar*, 563 F.3d at 13 n.4. Generally, where a party clearly had the opportunity to raise the claim below, no manifest injustice would result from an appellate court's refusal to hear the claim for the first time on appeal. *See Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994). Appellants clearly had the opportunity to raise this issue below given that their allegations in support of a claim of criminal enterprise are merely derivatives of Appellants' other theories. Accordingly, the Court finds no need to further examine this claim.

### 4. Fraudulent Transfer

Appellants also contend that, because the underlying CFA note and mortgage were not valid, the execution of the Pre-Negotiation Agreement amounted to the transfer of a property right – in the form of a lien on Appellants' properties — to Appellee. (Appellants' Br. at 18.) They allege that this transfer was a fraudulent one pursuant to New York Debtor and Creditor Law §§ 270, et seq., because the basis of the Agreement — the CFA note and mortgage — was invalid.[6] (*Id.*) This argument is baseless and is premised on at least two false assumptions: (1) that the underlying CFA note and mortgage were invalid (*id.*); and (2) that the Pre-Negotiation Agreement constituted a "transfer," as it conferred a

property right upon Appellee (*id.* at 11-12, 17-23).

First, the Court has already dismissed each of Appellants' theories offered in support of the first assumption. *See supra* Part III.A. Thus, there can be no basis for believing that the CFA note and mortgage were invalid.

Second, the Pre-Negotiation Agreement did not constitute a transfer of a property right. Appellants claim that the "right to defend a foreclosure action brought against a Debtor's real property is an intangible property right," but fail to state why this is so. (Appellants' Br. at 12.) Appellants further argue that the release of a property right through an agreement constitutes a transfer of that property right. (*Id.*) The Court finds instead that the Pre-Negotiation Agreement constituted a contract, through which Appellants ratified a prior transaction. Therefore, even if the CFA note and mortgage were in fact invalid, Appellants' argument would still fail because a ratification of a former transaction is clearly not a transfer within the meaning of the fraudulent conveyance statutes. By the time ratification occurs, the unauthorized or voidable transfer transaction has already been completed and, at that point, may only be voided or ratified. *See In re Best Prods. Co., Inc.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) ("A fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance."); s*ee also Cohen v. Treuhold Capital Group, LLC (In re Cohen)*, 422 B.R. 350, 371 (E.D.N.Y. 2010) (holding that an unauthorized property transfer effectuated by an agent and not evidenced by a signed writing could be subsequently ratified by the principal). When Appellants executed the Agreement, any transfer that occurred was already completed. Thus, the execution of

---

[6] Appellants argue that the Court should not permit the Pre-Negotiation Agreement to "create a valid lien in the place of a lien that otherwise would have been declared invalid." (*Id.*)

11

the Pre-Negotiation Agreement did not "create" a lien; it merely ratified the prior transaction. (J.A. at 351.)

Moreover, Appellants have failed to demonstrate that there was anything fraudulent about the transactions at issue. Under New York law:

> [A] person challenging a transfer of the debtor's property as constructively fraudulent . . . must show that it was made without fair consideration and (1) the debtor was insolvent or was rendered insolvent by the transfer, NYDCL § 273, (2) the debtor was left with unreasonably small capital, *id.*, § 274, or (3) the debtor intended or believed that it would incur debts beyond its ability to pay when the debts matured. *Id.*, § 275.

*Nirvana Rest. Inc. v. Paul's Laundromat, Inc. (In re Nirvana Rest. Inc.)*, 337 B.R. 495, 501 (Bankr. S.D.N.Y. 2006). As noted above, the Court has found that the Pre-Negotiation Agreement did not lack consideration. *See supra* Part III.B.1. Accordingly, we affirm the Bankruptcy Court's dismissal of Appellants' claim of fraudulent conveyance.

### 5. Equitable Subordination

Alternatively, Appellants request that Appellee's claim be subordinated to all other claims in the bankruptcy on equitable grounds. (Appellants' Br. at 23-24.) The doctrine of equitable subordination is codified in Section 510(c) of the Bankruptcy Code. 11 U.S.C. § 510(c). It authorizes the Bankruptcy Court to subordinate a claim where: (1) "[t]he claimant engaged in some type of inequitable conduct"; (2) "[t]he misconduct caused injury to the creditors or

conferred an unfair advantage on the claimant"; and (3) "[e]quitable subordination of the claim is consistent with bankruptcy law." *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994) (quoting *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977)); *see 9281 Shore Rd. Owners Corp. v. Seminole Realty Co. (In re 9281 Shore Rd. Owners Corp.)*, 187 B.R. 837, 852 (E.D.N.Y. 1995). "Inequitable conduct is generally defined as either (1) fraud, illegality, or breach of fiduciary duties; (2) undercapitalization; or (3) the claimant's use of the debtor as a mere instrumentality or alter ego." *N.J. Steel Corp. v. Bank of N.Y.*, No. 95 Civ. 3071 (KMW), 1997 WL 716911, at *4 (S.D.N.Y. Nov. 17, 1997) (citation omitted). "[A]nalysis of these factors differs, however, depending on the status of the creditor, specifically, whether the creditor acted as a[n] insider or an ordinary creditor."[7]   *Id.*   Because an ordinary

---

[7] In addition to the Bankruptcy Code's definition of the term "insider," 11 U.S.C. § 101(31), "courts have uniformly held that the Bankruptcy Code's definition is merely illustrative and that the term 'insider' must be flexibly applied on a case-by-case basis." *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 499 (S.D.N.Y. 1994).

> In determining whether a creditor is an "insider" of the debtor under this flexible approach, courts have considered a wide variety of factors, including whether the creditor: (i) received information from the debtor that was not available to other creditors, shareholders and the general public; (ii) attempted to influence decisions made by the debtor; (iii) selected new management for the debtor; (iv) had special access to the debtor's premises and personnel; (v) was the debtor's sole source of financial support; and (vi) generally acted as a joint venturer or prospective partner with the debtor rather than an arms-length creditor.

creditor, like Appellee, does not owe a
fiduciary duty to the debtor, it is rare for a
court to subordinate claims arising out of
such arms-length dealings. *See 80 Nassau
Assocs.*, 169 B.R. at 838.  In the case of non-
insider creditors, "unless the claimant
controls the debtor, and exercises that
control to gain an unfair advantage, the
proponent of equitable subordination must
show wrongful conduct involving fraud,
illegality or some other breach of a legally
recognized duty." *Id.* at 839.

Aside from making bare allegations,
Appellants fail to show how Appellee
committed fraud.  For example, in making
their claim of equitable subordination,
Appellants label Appellee's behavior as
"outrageous, in bad faith, and wholly
inequitable" but fail to ground this
conclusion in fact or law. (Appellants' Br.
at 24).  Appellants plainly do not meet the
pleading requirements as set forth in
*Twombly*. 550 U.S. at 555 ("[A] plaintiff's
obligation to provide the 'grounds' of his
'entitle[ment] to relief' requires more than
labels and conclusions, and a formulaic
recitation of the elements of a cause of
action will not do" (alteration in original)
(citation omitted).).  Additionally, any
reliance by Appellants on other arguments
raised in their brief, including their claim of
fraudulent conveyance, is misplaced given
the rejection of those claims above.
Accordingly, the Court affirms the
Bankruptcy Court's dismissal of Appellants'
equitable subordination claim as well,
because Appellants cannot satisfy even the
first element of equitable subordination.

6.  Waiver of Preference Claim

Appellants state in the "Statement of the
Issues Presented" section of their brief that
"[t]he Court below erred when holding that
execution and delivery of the Pre-
Negotiation Agreement was not an unlawful
preference by the Debtors." (Appellants'
Br. at 2.)  Other than this cursory mention of
the claim, Appellants do not raise the issue
again until their reply brief.    There,
Appellants devote a total of three sentences
to this claim, in which they either cite to
non-existent portions of their brief or mis-
cite portions of their brief. (Appellants'
Reply Br. at 8.)  The one sentence proffered
in support of this claim — that the "Pre-
Negotiation Agreement was for the
excessive benefit of CFA and of no benefit
to the Debtors and other creditors" (*id.*) — is
conclusory and contradicts several
undisputed facts in the record, *see supra* Part
III.B.

Accordingly, the Court concludes that
Appellants waived their claim of unlawful
preference. (Appellants' Br. at 2.) "Issues
not sufficiently argued in the briefs are
considered waived and normally will not be
addressed on appeal." *Norton v. Sam's
Club*, 145 F.3d 114, 117 (2d Cir. 1998).
Here, Appellants failed to meet even the
modest requirements of Rule 8010 of the
Federal Rules of Bankruptcy Procedure. *See*
Fed. R. Bankr. P. 8010(a)(1)(E) ("The
argument shall contain the contentions of the
appellant with respect to the issues
presented, and the reasons therefor, with
citations to the authorities, statutes and parts
of the record relied on.").  Appellants' mere
passing mention of the issue is completely
devoid of analysis, and is thus deemed a
waiver of it. *See Gazes v. Stephenson (In re
Stephenson)*, Nos. 96 Civ. B. 557, 96 Civ.
558 (DC), 1996 WL 403087, at *1
(S.D.N.Y. July 18, 1996) ("Appellant has

*Id.* at 500 (internal quotation marks and citations
omitted).  Appellee does not fall within any of these
definitions of "insider."

utterly failed to comply with Bankruptcy Rule 8010 . . . . Such a failure is grounds for dismissing a bankruptcy appeal.").

Moreover, even if the preference claim were properly raised before the Court, it would still fail because Appellants did not plead all of the necessary elements in their complaint. Specifically, as the Bankruptcy Court correctly concluded, Appellants failed to meet at least two elements required by 11 U.S.C. § 547(b). (J.A. at 352-53.) First, the Pre-Negotiation Agreement is not alleged to have been made on account of an antecedent debt. *See* 11 U.S.C. § 547(b)(2). Appellants have already conceded that they executed the Agreement as a pre-condition to discussing settlement options, and therefore, not on account of an antecedent debt. (J.A. at 68 ¶¶ 58, 58A.) Second, Appellants failed to even address § 547(b)(5), which states, *inter alia*, that a "trustee may avoid any transfer of an interest of the debtor in property that enables such creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of this title; [and] (B) the transfer had not been made." 11 U.S.C. § 547(b)(5). Importantly, this claim also suffers from the same deficiency found in Appellants' fraudulent transfer argument — namely, it relies on the false assumption that the Pre-Negotiation Agreement constituted a transfer. As explained above, the Agreement was not a transfer but an enforceable contract. Accordingly, for the aforementioned reasons, the Court concurs with the Bankruptcy Court's dismissal of Appellants' preference claim.

### 7. Public Policy

Finally, the Court finds no reason to reverse the Bankruptcy Court's decision on grounds of public policy. (Appellants' Br. at 24-25.) Contrary to Appellants'

assertions, the Pre-Negotiation Agreement is not inconsistent with New York's public policy encouraging settlements, nor is it inadmissible as a settlement discussion pursuant to Federal Rule of Evidence 408. (*See id.*) Here, the parties drafted and executed the Pre-Negotiation Agreement in order to effectuate, not deter, settlement discussions. (J.A. at 68.) While Rule 408 bars the admission of most evidence of settlements, it does not bar all such evidence. "Evidence of an offer to compromise . . . can fall outside the Rule if it is offered for 'another purpose,' *i.e.*, for a purpose other than to prove or disprove the validity of the claims that the offers were meant to settle." *Trebor Sportswear Co., Inc. v. The Ltd. Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989) (citing Fed. R. Evid. 408). Here, the Agreement is evidence of Appellants' intent to ratify the underlying CFA note and mortgage rather than proof of the contents of any offer to settle. The Agreement does not reveal the contents of any settlement discussions or offers that took place between the parties, and clearly states that while "[a]ll negotiations and discussions concerning the Loan . . . shall constitute settlement discussions . . . and may not be used or admitted into evidence in any court proceeding," the "*letter agreement* and the acknowledgements by Borrower contained [t]herein *may be admitted into evidence* in any such proceeding." (J.A. at 76 ¶ 3 (emphasis added).) Thus, the Agreement cannot itself be characterized as a settlement discussion.

Notably, Appellants do not cite to a single case from this jurisdiction where a court has found a pre-negotiation agreement to be invalid on grounds of public policy. To the contrary, courts have consistently *upheld* comparable pre-negotiation agreements on the basis of New York's policy favoring the enforcement of

unambiguous contracts.   For example, in *Federal Home Loan Mortgage Corp.*, Judge Patterson enforced the terms set forth in a "pre-negotiation letter agreement" similar to the one at issue here.   1996 WL 15680, at *1-3 (upholding agreement whereby lender reserved the right to cease negotiations at any time and to execute all legal and equitable rights, including foreclosure, given the "clear language" of the agreement). Likewise, New York state courts have found agreements similar to the one presently being challenged to be enforceable and valid contracts.  *See 23rd St. Dev., LLC*, 2009 WL 3337595, at *1-3 (enforcing a pre-negotiation agreement that allowed the creditor to terminate negotiations for "any reason or no reason" and that resulted in debtor's waiver of any "defense, setoff, claim, counterclaim or cause of any kind or nature whatsoever with respect to the Loan Documents"); *U.S. Bank Nat'l Ass'n v. 653 Eleventh Ave. LLC*, No. 117075/08, 2009 WL 1449082, at *1-3 (N.Y. Sup. Ct. May 19, 2009) (finding provisions in post-maturity agreements to be enforceable, including waiver of defenses and reservation of lender's right to foreclose).   Accordingly, the Court concludes that the Pre-Negotiation Agreement at issue in this case does not run counter to public policy.

## IV. CONCLUSION

For the foregoing reasons, the Court affirms the Bankruptcy Court's August 2009 Order.   The Clerk of the Court is respectfully directed to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: November 1, 2010
        New York, New York

* * *

Appellants are represented by Carl E. Person, 325 W. 45th St., Suite 201, New York, New York, 10036.   Appellee is represented by David Lawrence Birch of Hofheimer, Gartlir & Gross, LLP, 530 Fifth Ave., 9th Floor, New York, New York, 10036.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/1/10